# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LEROY KECK, JR., | : CASE NO. 3:12-cv-02188-GBC |
| | : |
| Plaintiff, | : (MAGISTRATE JUDGE COHN) |
| | : |
| v. | : MEMORANDUM TO DENY PLAINTIFF'S |
| | : APPEAL |
| CAROLYN W. COLVIN, | : |
| ACTING COMMISSIONER OF | : Docs. 9,12,13,15 |
| SOCIAL SECURITY, | : |
| | : |
| Defendant. | : |

## MEMORANDUM TO DENY PLAINTIFF'S APPEAL

### I. Procedural History

On April 13, 2010 and April 16, 2010, Leroy Keck, Jr. ("Plaintiff") protectively filed an application for Title II Social Security Disability Insurance Benefits ("DIB"), and also protectively filed a Title XVI application for Supplemental Security Income ("SSI"), with an onset date of November 21, 2008. (Tr. 66, 68, 150, 190-91).

This application was denied, and on July 20, 2011, a hearing was held before an Administrative Law Judge ("ALJ"), where Plaintiff appeared with counsel and testified, as did a vocational expert (Tr. 30-62). On September 24, 2011, the ALJ issued a decision finding that Plaintiff was not entitled to DIB or SSI because Plaintiff could perform a range of range of simple, sedentary work with limited interpersonal interactions (Tr. 17). On September 28, 2012, the Appeals Council denied Plaintiff's request for review, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1).

On November 2, 2012, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. §§ 405(g); 1383(c)(3), to appeal the decision of the Commissioner of the Social Security Administration denying social security benefits. Doc. 1. On December 20, 2012, Commissioner filed an answer and administrative transcript of proceedings. Docs. 8,9. In March and April 2013, the parties filed briefs in support. Docs. 12,13. On April 29, 2014, the Court referred this case to the undersigned Magistrate Judge. On May 13, 2014, the Court issued an order providing Plaintiff the opportunity to file a reply brief and notifying the parties of the option to consent to Magistrate Judge jurisdiction. Doc. 14. On May 21, 2014, the parties consented to Magistrate Judge jurisdiction, and Plaintiff filed a reply brief in accordance with the Court's order. Docs. 15,16.

## II.     Standard of Review

When reviewing the denial of disability benefits, we must determine whether the denial is supported by substantial evidence. Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Johnson v. Commissioner of Social Sec., 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 564

(1988); Hartranft v. Apfel, 181 F.3d 358, 360. (3d Cir. 1999); Johnson, 529 F.3d at 200.

This is a deferential standard of review. See Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence is satisfied without a large quantity of evidence; it requires only "more than a mere scintilla" of evidence. Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999). It may be less than a preponderance. Jones, 364 F.3d at 503. Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands. Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986).

To receive disability or supplemental security benefits, Plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A).

Moreover, the Act requires further that a claimant for disability benefits must show that he has a physical or mental impairment of such a severity that: "he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

//

//

### III. Relevant Facts in the Record

### A. Background

Plaintiff is a forty year old male who was thirty-five years old at the time of the application, which is classified as a younger individual (20 C.F.R. §§ 404.1563, 416.963) (Tr. 150, 157, 190-91). Plaintiff dropped out of school in the ninth grade (Tr. 36). Plaintiff had special education classes when he was in school (Tr. 47). Plaintiff had past relevant work as a heavy equipment operator, classified as heavy and semi-skilled with skills transferable to medium work only (Tr. 59). Plaintiff worked for many years in the construction industry, most recently in semi-skilled work operating heavy equipment (Tr. 36, 59, 181, 185-86).

Plaintiff had two children, each of whom lived with their respective mothers (Tr. 36, 46). He had not seen his 18 year-old son in a decade and visited his 10 year-old daughter only "once in a great blue moon" (Tr. 46). It appears that he had been paying child support for both children until he left his job in 2008 (Tr. 164, 167). Since then, his stated source of income was his long-term girlfriend – who was herself on disability (Tr. 315) – and his mother (Tr. 37, 47).

Plaintiff claimed that his knee and back pain was so extreme that his girlfriend (who was herself disabled) allegedly not only helped dress him but even had to help him use the toilet (Tr. 237). However, there is no record at any doctor's visits of statements of these limitations. When Plaintiff applied for disability benefits, he had not seen a doctor for any physical complaints in more than two years (Tr. 352, 366). He also admitted that he used no pain medications (Tr. 228).

Plaintiff testified at the time of the hearing he weighed 392 pounds and had gained some 75-100 pounds since he was working (Tr. 47).

The Administrative Law Judge found severe impairments of bilateral degenerative joint

disease, morbid obesity, major depressive disorder (Tr. 14). The Administrative Law Judge found that the Plaintiff's low back pain and mild mental retardation were not medically determinable impairments (Tr. 15).

## B. Relevant Medical Evidence

### 1. Medical Evidence Related to Plaintiff's Physical Impairments

The primary physical problem Plaintiff identified was arthritis pain in the knees that, he testified, felt like "someone beating [his] kneecaps with a baseball bat" (Tr. 39).

The agency initially arranged for a consultative examination with Jessica Ward, D.O (Tr. 319-29). This early report accepted most of Plaintiff's subjective complaints, recommended an assessment by a psychologist, and found some extreme limitations (including "never" performing any postural maneuvers) (Tr. 326) that the ALJ found inconsistent with the record (Tr. 19).

In June 2010, a year and a half after Plaintiff's alleged disability onset date, he first appeared for a medical appointment with primary care physician Kendra Davis, D.O. (Tr. 150, 399). Plaintiff reported arthritis in his knees and back for which he used only Tylenol (Tr. 399). Thoracic and lumbar mobility were decreased, with spinal and knee tenderness and "moderate" pain with motion of the knees (Tr. 401). X-rays of the cervical spine were negative (Tr. 329).

Follow-up treatment with Dr. Davis showed diabetes without complication (Tr. 397). Plaintiff also initiated treatment with orthopedic specialists in August 2010 (Tr. 380). He was taking Naprosyn (a non-steroidal anti-inflammatory) and Vicodin (a narcotic) (Tr. 380). Plaintiff was overweight and displayed some breakaway weakness in the lower extremities, but his motor examination was close to normal limits, and sensory function was grossly intact (Tr. 380). Despite being exquisitely sensitive to palpation of the knees, he exhibited nearly normal range of motion (Tr.

381). X-rays showed "no signs of arthritis" (Tr. 381). Only "mild" degenerative changes were apparent (Tr. 381). The orthopedist did not "see anything intrinsically wrong with [Plaintiff's] knees" (Tr. 381).

Follow-up orthopedic notes later that month show Plaintiff ambulating with a cane and continuing to react to palpation of the knees (Tr. 379). Again, however, no orthopedic cause for his pain was identified (Tr. 379).

Plaintiff also complained of back pain, which he described at the hearing as feeling like a "locomotive just ran over me" (Tr. 51), but lumbar MRI films were essentially normal: they showed no degenerative disease and no evidence of herniated disks (Tr. 379).

Plaintiff complained again of knee pain in July 2011 (Tr. 421). His treating orthopedist explained that Plaintiff's pain was "out of proportion" to objective findings and could only be ascribed to possible undiagnosed non-orthopedic causes (like regional pain syndrome) (Tr. 422). Anterior ligament examination also caused "pain out of proportion" (Tr. 421). X-rays, "quite surprisingly," showed few arthritic changes and no acute abnormalities (Tr. 421).

### 2. Medical Evidence Related to Plaintiff's Mental Health

### A. Plaintiff's Depression

Plaintiff had never seen a psychiatrist or counselor for his alleged depression until he was incarcerated in November 2009 (Tr. 307). At that time, Plaintiff initiated treatment with Celexa, an antidepressant (Tr. 307). Within weeks, Plaintiff's mood was "euthymic" (Tr. 306). His mental status was entirely normal (Tr. 306). But he discontinued his medication after leaving incarceration (Tr. 314).

Plaintiff waited eight months before resuming mental health treatment. In May 2010,

outpatient psychiatrist Sylvester De La Cruz, M.D., found Plaintiff to be depressed, with a global assessment of functioning (GAF) score of 50-55 (Tr. 311, 316). He prescribed Lexapro (Tr. 316). Even though Plaintiff had only reinitiated treatment that day, Dr. De La Cruz immediately completed a Pennsylvania Department of Welfare form asserting that Plaintiff would be temporarily disabled for 12 months or more (Tr. 311). But Plaintiff improved  rapidly thereafter, as he personally acknowledged (Tr. 233). Follow-up office notes from Dr. De La Cruz likewise confirm, month after month, that Plaintiff's mental status was virtually or entirely normal, with a fair or even euthymic mood (Tr. 373-78, 418-19).

In the winter of 2011, Plaintiff reported that "life [was] going well" (Tr. 378). He declared that he "no longer need[ed] to continue his individual counseling" (Tr. 418). Treatment notes confirm that his depression was "in remission" (Tr. 378).

## B. Allegations of Bipolar Disorder

Plaintiff alleged he was bipolar (Tr. 41, 189, 224), but this was rejected by Dr. De La Cruz because Plaintiff had never experienced manic symptoms or episodes of elation, euphoria, or grandiosity (Tr. 314, 316, 375).

Nonetheless, Plaintiff apparently communicated thereafter to his primary care physician, Dr. Davis, that he was bipolar and that his mood was not controlled (Tr. 404, 409). Not only did Dr. De La Cruz's records show otherwise, but Dr. Davis' own treatment notes also documented "no unusual anxiety or evidence of depression" (Tr. 388, 406, 410). Nonetheless, Dr. Davis offered an opinion that Plaintiff was totally disabled from, among other things, a mood disorder and "possible bipolar disorder" (Tr. 416).

### C. Allegations of Intellectual Disability[1]

Plaintiff noted a history of special education but never alleged disability based on intellectual disability (mental retardation) (Tr. 37, 46, 189).

The night before his disability hearing, Plaintiff's attorney referred him for a psychological evaluation with William D. Thomas, M.S., who performed IQ testing on Plaintiff on July 17, 2011 and found a verbal IQ of 70, a performance IQ of 74 and a full scale IQ of 69 (Tr. 429).

Treating psychiatrist Dr. De La Cruz found Plaintiff's thinking organized, his mathematical skills "good," and his proverb interpretations abstract (Tr. 315). Dr. De La Cruz described his patient as appearing to have intelligence "within [the] average range" (Tr. 315).

### IV.    Review of ALJ Decision

A five-step evaluation process is used to determine if a person is eligible for disability benefits. See 20 C.F.R. §§ 404.1520, 416.920; see also Plummer, 186 F.3d at 428. If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed any further. See 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. See 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional

---

[1] Until very recently, the Commissioner's regulations employed the term "mental retardation" in this section, and the case law in this area consistently uses the former term.

capacity (RFC).  20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that she is unable to engage in past relevant work. If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the plaintiff. See 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

## A.    Plaintiff Allegations of Error

### 1.    Intellectual Disability Severe / Listed Impairment

Plaintiff contends the ALJ failed to classify intellectual disability (mental retardation) as a "severe" impairment. Pl. Br. at 5, 8-10, Doc. 12. Plaintiff also contends Plaintiff meets the requirements of listing 12.05 (Intellectual disability: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22 . . . [and] (C.) A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function OR (D.) A valid verbal, performance, or full scale IQ of 60 through 70, resulting in two of the following: 1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence or pace; or 4. Repeated episodes of decompensation, each of extended duration.). Pl. Br. at 8, Doc 12; 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05 (C, D).

"For a claimant to show that his impairment matches a listing, it must meet all of the

specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530 (1990).

a. **Listing 12.05 Intellectual Disability Diagnostic Description**

Listing 12.05 contains two parts: an introductory paragraph, and a set of four criteria (A, B, C, or D) for determining whether the required level of severity for the disorder has been established. 20 C.F.R., Pt. 404, Subpt. P, Appx. 1 § 12.05. The introductory paragraph of listing 12.05 contains the diagnostic description for intellectual disability: "Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." Id. If the impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing." <u>See Ogin v. Commissioner of Social Sec.</u>, No. 3:13–cv–01365, 2014 WL 2940599, at *9 (M.D. Pa. June 30, 2014).

Plaintiff contends he meets the criteria for the diagnostic description of listing 12.05. Pl. Br. at 9, Doc 12. The Commissioner argues the record does not show any deficits in adaptive functioning. Comm'r Br. at 15, Doc 13. Specifically, the Commissioner states that the psychologist, William Thomas, did not even explore Plaintiff's adaptive history in his report (Tr. 429-432). Nor could Mr. Thomas' diagnostic impression be squared with the notes from Dr. De La Cruz, who had a longstanding treating relationship with Plaintiff but never diagnosed any intellectual impairment (Tr. 315-17, 373-78, 418-20). On the contrary, Dr. De La Cruz found that Plaintiff exhibited "good" mathematical skills, appropriate abstraction, and organized thinking – with intelligence in the "average range" (Tr. 315). Comm'r Br. at 15, Doc. 13.

Plaintiff contends his deficits in adaptive functioning did manifest during the developmental period as he was in special education (Tr. 47), and evidence of IQ testing during the developmental years would not necessarily be required to meet listing 12.05. Pl. Br. at 9, Doc 12.

Commissioner states Plaintiff was described by his own treating psychiatrist as having average intelligence (Tr. 15, 16, 37, 59, 185-86, 189, 191, 221-23, 315). Comm'r Br. at 14, Doc 13.

In Ogin, a recent Middle District Court case, the cited ALJ decision made the following analysis regarding the diagnostic description element of the listing. "When viewing the [Plaintiff's] adaptive functioning it appears that he has obtained a drivers license, and thereby passed both the written exam and field test, he engages in child care and parental oversight, helps out with chores around the house, performs his activities of daily living and [is] independent regarding self-care, personal hygiene and daily routines. He is also apparently able to do some simple meal preparation. The [Plaintiff's] wife works, and thus the [Plaintiff] does have time home by himself, and also with the kids for intervals of time. There also appear to be intervals of work efforts including sales associate at a retail store." Ogin, No. 3:13–cv–01365, 2014 WL 2940599, at *9.

In the instant case, Plaintiff appears to show more adaptive functioning than in Ogin. The ALJ reviewed the record to determine whether Plaintiff met the criteria for intellectual disability (mental retardation).

**b. ALJ Review and Findings For Plaintiff's Mental Health and Intellectual Disability**

"The claimant has the . . . severe impairment[] . . . Major Depressive Disorder. 20 C.F.R. § 404.1520(c) and 416.920(c)." (Tr. 14).

"In July 2011, the claimant also presented to William B. Thomas, M.S., for consultative psychological evaluation and administration of intelligence testing suggesting the claimant has a

valid Verbal IQ of 70 and Full Scale IQ of 69. Given the scores obtained on testing, as well as the

correlation with additional testing performed in the past, not submitted to the record, Mr. Thomas

diagnosed the claimant with Mild Mental Retardation. <u>The [ALJ] does not accept this diagnosis as</u>

<u>Mr. Thomas noted the claimant admitted having held a number of jobs including his most recent</u>

<u>work as a semi-skilled Heavy Equipment Operator. Mr. Thomas further observed the claimant to not</u>

<u>only answer direct questions but also to volunteer personally relevant information, and present as</u>

<u>friendly and interactive. These admissions and observations are inconsistent with the implicit deficits</u>

<u>in adaptive functioning necessary for a diagnosis of Mild Mental Retardation. The claimant's low</u>

<u>IQ scores could more consistently be attributed to the claimant's regression in Academic Skills noted</u>

<u>by Mr. Thomas. Moreover, the claimant's treating providers further observed and reported the</u>

<u>claimant to possess average intelligence.  Accordingly, the [ALJ] finds the claimant's Mild Mental</u>

<u>Retardation not medically determinable.</u>" (Tr. 15) (emphasis added).

"The severity of the claimant's mental impairment does not meet or medically equal the

criteria of listings 12.04 and 12.05." (Tr. 15).

"The claimant's impaired intellectual functioning does not meet the criteria for Listing 12.05.

Though the medical evidence demonstrates the claimant's valid verbal IQ scores and the remainder

of his medical impairments meet the requirements of both the 'B' and 'C' subsections, the claimant

does not satisfy the requirements of the Listing because <u>the claimant fails to demonstrate deficits in</u>

<u>adaptive functioning. The claimant admitted he retains the functional cognitive ability to perform</u>

<u>personal care activities, prepare meals, complete housework, and shop for groceries. Moreover, the</u>

<u>claimant did not allege disability due to any mental retardation.</u>" (Tr. 15-16) (emphasis added).

The claimant's depression also fails to meet the requirements of the Listing. In making this

finding, the [ALJ] has considered whether the 'paragraph B' criteria ('paragraph D' criteria of listing

12.05) are satisfied. To satisfy the 'paragraph B' criteria ('paragraph D' criteria of listing 12.05), the mental impairment must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." (Tr. 16).

"In activities of daily living, the claimant has no restriction. The claimant and his girlfriend both admitted the claimant retains the ability to perform all personal care activities, prepares his own meals daily, mow his grass, wash his laundry, perform household repairs, travel independently, use public transportation, shop in stores for up to three hours at one time, and manage money.  While the claimant requires additional time to perform his activities, this is due to his physical impairment and not due to any mental health problem. The record reveals no restriction in this area. The opinion of the State agency psychological consultant supports this assessment." (Tr. 16) (emphasis added).

"In social functioning, the claimant has moderate difficulties. The record demonstrates that while the claimant continues to experience extreme emotional liability and cries during medical encounters, he presents with good social skills on mental status examination. The [ALJ] also observed the claimant to present as articulate, intelligent, and with little difficulty with word usage or communication during the hearing. The record reveals no more than a moderate restriction in this area. The opinion of the State agency psychological consultant supports this assessment." (Tr. 16) (emphasis added).

"With regard to concentration, persistence or pace, the claimant has moderate difficulties. The claimant alleges difficulty concentrating and understanding. While his medical records suggest

a history of difficulties in this area, the claimant's impairment improved with medication. <u>His current records reveal grossly normal cognitive functioning with little impairment in his concentration, understanding, or memory</u>. The medical records also do not demonstrate any limitations in the claimant's ability to maintain pace, nor has the claimant alleged any such limitations." (Tr. 16) (emphasis added).

"As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration. Since the alleged onset date, the record demonstrates the claimant underwent no inpatient psychiatric hospitalizations, partial hospitalizations, or any form of increasingly intensive psychiatric or psychological treatment of sufficient duration to indicate an episode of decompensation." (Tr. 16-17).

"Because the claimant's mental impairment does not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration, the 'paragraph B' criteria ('paragraph D' criteria of listing 12.05) are not satisfied." (Tr. 17).

"The [ALJ] has also considered whether the 'paragraph C' criteria of 12.04 are satisfied. In this case, the evidence fails to establish the presence of the 'paragraph C' criteria. Specifically, there is no indication in the record of a chronic affective disorder of at least 2 years duration resulting in repeated episodes of decompensation, a residual disease process such that minimal increase in mental demands would result in decompensation, or a one year history of inability to function outside a highly supportive living arrangement." (Tr. 17).

"The limitations identified in the 'paragraph B' ('paragraph D' criteria of listing 12.05) criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and of 5 of the sequential evaluation process requires a more

detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p). Therefore, the following residual functional capacity assessment reflects the degree of limitation the [ALJ] has found in the 'paragraph B' mental function analysis." (Tr. 17).

"The [ALJ] also finds the claimant's conditions do not singly or in combination equal any of the Listings. The State agency consultant opined the claimant's conditions did not equal a Listing, and the [ALJ] received no evidence since the State agency consultant issued the opinion that would reasonably change the outcome." (Tr. 17).

"After careful consideration of the entire record, the [ALJ] finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) and 416.967(a) except the claimant is limited to the performance of simple, repetitive tasks involving no more than occasional interaction with supervisors or co-workers; no more than occasional bending, kneeling, stooping, crouching, balancing, or climbing; and no use of foot controls. The claimant also requires the use of a cane to ambulate." (Tr. 17).

"The claimant alleges disability due depression, Bipolar Disorder . . . Due to his impairments, the claimant stated he has difficulty . . . concentrating, understanding . . . and getting along with others." (Tr. 18).

"At the hearing, the claimant testified he stopped working because he could not climb up onto the work equipment secondary to pain . . . Due to his depression, the claimant reported suffering from mood swings, bursts of anger, and crying spells. The claimant also noted he experiences memory loss.'" (Tr. 18).

"Despite the claimant's mental health allegations, a State agency field office representative noted that during the claimant's initial telephone application interview, the claimant presented

without apparent difficulty understanding, concentrating, talking, answering questions, or maintaining coherency. During the hearing, the [ALJ] also observed the claimant as articulate, intelligent and without difficulties in word usage, recall, or communicating." (Tr. 18) (emphasis added).

"The claimant's girlfriend, Karen Seiders, also admitted that despite his allegations, the claimant retains the ability to perform all personal care activities, prepare his own meals daily, mow his grass, wash his laundry, perform household repairs, travel independently, shop in stores for up to three house at one time, and manage money, demonstrating a greater ability to perform physical and cognitive tasks than alleged in connection with his application and appeal." (Tr. 18) (emphasis added).

"The medical evidence also does not support the allegations regarding the intensity, persistence, and limiting effects of the claimant's impairments." (Tr. 19).

"With regard to the claimant's mental health impairments, the record demonstrates the claimant suffers from a longstanding history of depression, initially presenting with a symptom cluster including insomnia, decreased appetite, crying spells, feelings of hopelessness and worthlessness, social withdrawal, and anhedonia. However, the record reveals the claimant received no treatment for his condition until obtaining medication during a three-month incarceration in 2009. At that time, the claimant's providers noted his mental status to remain grossly normal, with no disturbance in cognition or memory, but with only some disturbed mood and affect." (Tr. 19) (emphasis added).

"During a May 2010 psychiatric evaluation, the claimant denied any significant impairment in his concentration or memory, but continued to complain of irritability and becoming angry easily, noting he received no medication for his impairment since release from prison nearly 10 months

prior. On a mental status examination, the claimant demonstrated good social skills, intact memory, organized cognition, and average intelligence. The claimant's psychiatrist, Sylvestre De La Cruz, M.D., diagnosed the claimant with Major Depressive Disorder and assessed a GAF of 55, consistent with no more than moderate symptoms or difficulties in social, occupational, or school functioning (Diagnostic and Statistical Manual of Mental Disorders – Fourth Edition (DSM-IV))." (Tr. 20) (emphasis added).

"The medical evidence does not support the allegations regarding the intensity, persistence, and limiting effects of the claimant's impairments. As discussed above, the medical evidence does not support the claimant's allegations regarding the severity and extent of his . . . mild mental retardation . . . While the claimant alleges difficulty concentrating and understanding, the claimant's mental status examinations and continuing treatment notes reveal the claimant demonstrates normal cognitive functioning, motivation, and memory. The medical evidence does not support the claimant's allegations." (Tr. 21) (emphasis added).

### c. Summary of ALJ Findings and Analysis for Intellectual Disability

Plaintiff contends he meets the criteria for intellectual disability (mental retardation) as a "severe" or "listed" impairment. Pl. Br. at 5, 8-10, Doc. 12. The ALJ throughly evaluated the record and made extensive findings regarding Plaintiff's mental health and allegations of intellectual disability (mental retardation).

"The claimant has the . . . severe impairment[] . . . Major Depressive Disorder; in July 2011, the claimant also presented to William B. Thomas, M.S., for consultative psychological evaluation and administration of intelligence testing suggesting the claimant has a valid Verbal IQ of 70 and Full Scale IQ of 69. Given the scores obtained on testing, as well as the correlation with additional testing performed in the past, not submitted to the record, Mr. Thomas diagnosed the claimant with

Mild Mental Retardation. <u>The [ALJ] does not accept this diagnosis as Mr. Thomas noted the</u>

<u>claimant admitted having held a number of jobs including his most recent work as a semi-skilled</u>

<u>Heavy Equipment Operator. Mr. Thomas further observed the claimant to not only answer direct</u>

<u>questions but also to volunteer personally relevant information, and present as friendly and</u>

<u>interactive. These admissions and observations are inconsistent with the implicit deficits in adaptive</u>

<u>functioning necessary for a diagnosis of Mild Mental Retardation. The claimant's low IQ scores</u>

<u>could more consistently be attributed to the claimant's regression in Academic Skills noted by Mr.</u>

<u>Thomas. Moreover, the claimant's treating providers further observed and reported the claimant to</u>

<u>possess average intelligence.  Accordingly, the [ALJ] finds the claimant's Mild Mental Retardation</u>

<u>not medically determinable</u>; [t]he severity of the claimant's mental impairment does not meet or

medically equal the criteria of listings 12.04 and 12.05; [t]he claimant's impaired intellectual

functioning does not meet the criteria for Listing 12.05. Though the medical evidence demonstrates

the claimant's valid verbal IQ scores and the remainder of his medical impairments meet the

requirements of both the 'B' and 'C' subsections, the claimant does not satisfy the requirements of

the Listing because <u>the claimant fails to demonstrate deficits in adaptive functioning. The claimant</u>

<u>admitted he retains the functional cognitive ability to perform personal care activities, prepare meals,</u>

<u>complete housework, and shop for groceries. Moreover, the claimant did not allege disability due</u>

<u>to any mental retardation</u>; [i]n activities of daily living, the claimant has no restriction. The claimant

and his girlfriend both admitted the claimant retains the ability to perform all personal care activities,

prepares his own meals daily, mow his grass, wash his laundry, perform household repairs, travel

independently, use public transportation, shop in stores for up to three hours at one time, and manage

money.  While the claimant requires additional time to perform his activities, this is due to his

physical impairment and not due to any mental health problem. The record reveals no restriction in

this area. The opinion of the State agency psychological consultant supports this assessment; [i]n social functioning, the claimant presents with good social skills on mental status examination. The [ALJ] also observed the claimant to present as articulate, intelligent, and with little difficulty with word usage or communication during the hearing. The record reveals no more than a moderate restriction in this area. The opinion of the State agency psychological consultant supports this assessment; [h]is current records reveal grossly normal cognitive functioning with little impairment in his concentration, understanding, or memory. The medical records also do not demonstrate any limitations in the claimant's ability to maintain pace, nor has the claimant alleged any such limitations; [d]espite the claimant's mental health allegations, a State agency field office representative noted that during the claimant's initial telephone application interview, the claimant presented without apparent difficulty understanding, concentrating, talking, answering questions, or maintaining coherency. During the hearing, the [ALJ] also observed the claimant as articulate, intelligent and without difficulties in word usage, recall, or communicating; [t]he claimant's girlfriend, Karen Seiders, also admitted that despite his allegations, the claimant retains the ability to perform all personal care activities, prepare his own meals daily, mow his grass, wash his laundry, perform household repairs, travel independently, shop in stores for up to three house at one time, and manage money, demonstrating a greater ability to perform physical and cognitive tasks than alleged in connection with his application and appeal; [w]ith regard to the claimant's mental health impairments, the record . . . reveals the claimant received no treatment for his condition until obtaining medication during a three-month incarceration in 2009. At that time, the claimant's providers noted his mental status to remain grossly normal, with no disturbance in cognition or memory, but with only some disturbed mood and affect; [d]uring a May 2010 psychiatric evaluation, the claimant denied any significant impairment in his concentration or memory, but continued to

complain of irritability and becoming angry easily, noting he received no medication for his impairment since release from prison nearly 10 months prior. On a mental status examination, the claimant demonstrated good social skills, intact memory, organized cognition, and average intelligence. The claimant's psychiatrist, Sylvestre De La Cruz, M.D., diagnosed the claimant with Major Depressive Disorder and assessed a GAF of 55, consistent with no more than moderate symptoms or difficulties in social, occupational, or school functioning (Diagnostic and Statistical Manual of Mental Disorders – Fourth Edition (DSM-IV)); As discussed above, the medical evidence does not support the claimant's allegations regarding the severity and extent of his . . . mild mental retardation . . . While the claimant alleges difficulty concentrating and understanding, the claimant's mental status examinations and continuing treatment notes reveal the claimant demonstrates normal cognitive functioning, motivation, and memory. The medical evidence does not support the claimant's allegations." (Tr. 14-16, 18-21) (emphasis added).

Thus, the ALJ did not find that Plaintiff met the diagnostic description criteria of adaptive deficits prior to age 22 under listing 12.05. Moreover, the ALJ may reject IQ scores that are inconsistent with the record as long as he adequately explains his basis for doing so. Schmidt v. Commissioner of Social Security, 2013 WL 1386881 at *1 (W.D. Pa.) (citing Miller v. Astrue, 2011 WL 2580516 at *6 n.5 (E.D. Pa.) (quoting Lax v. Astrue, 489 F.3d 1080, 1087 (10th Cir. 2007 (upholding the ALJ's rejection of IQ scores as invalid because it was "not an accurate reflection of [a claimant's] intellectual abilities.")).

In Gist v. Barnhart, 67 F. App'x 78, 81 (3d Cir. 2003), because the claimant "failed to prove an onset of 'deficits in adaptive functioning' . . . her satisfaction of the two specific requirements of Listing 12.05C, namely an IQ score between 60 and 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of functions, [was] irrelevant." Id. at

82 n.2. The ALJ in this case made the same finding, namely, that any diagnosis of mental retardation suggested by one-time consultant Mr. Thomas was "inconsistent with the implicit deficits in adaptive functioning necessary for a diagnosis of Mild Mental Retardation." (Tr. 15).

Plaintiff argues he meets Listing 12.05D; however, there was no evidence in the record to support any finding of "marked" limitations in social functioning, daily activities, or concentration, persistence or pace, and Plaintiff never experienced an episode of decompensation. On the contrary, Plaintiff attested to a wide array of daily activities; he lived with his girlfriend for ten years, spoke on the phone daily with family and friends, and received visitors routinely (Tr. 35, 44, 202, 206, 223); and his concentration was "good." (Tr. 420).

The record failed to denote any deficits in adaptive functioning. Mr. Thomas did not even explore Plaintiff's adaptive history in his report (Tr. 429-432). Nor could Mr. Thomas' diagnostic impression be squared with the notes from Dr. De La Cruz, who had a longstanding treating relationship with Plaintiff but never diagnosed any intellectual impairment (Tr. 315-17, 373-78, 418-20). On the contrary, Dr. De La Cruz found that Plaintiff exhibited "good" mathematical skills, appropriate abstraction, and organized thinking – with intelligence in the "average range" (Tr. 315). Consistent with Dr. De La Cruz's records, as well as Plaintiff's history of semi-skilled work and independent living, the ALJ was permitted to conclude, as he did, that Plaintiff did not meet the criteria for an intellectual disability (mental retardation) under listings 12.05C or D.

Plaintiff states in his reply that normal findings in regular mental health treatment sessions do not necessarily mean that the individual would be capable of sustaining those same normal findings when subjected to the stress of work activity. (Pl. Reply at 2, Doc. 15).

However, the regulations require the ALJ to find that Plaintiff's disability is expected to last continuously for a year. To receive disability or supplemental security benefits, Plaintiff must

demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last <u>for a continuous period of not less than 12 months</u>." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A) (emphasis added). Thus, Plaintiff's impairments and inability to do activities must also meet the durational requirement.

Plaintiff contends the ALJ failed to classify the  intellectual disability (mental retardation) as a "severe" impairment. Pl. Br. at 5, 10, Doc. 12. However, even though the ALJ did not classify the impairment as "severe," he accounted for the credibly established limitations in the residual functional capacity.

"[Plaintiff] contends that the ALJ erred in failing to determine whether his obesity was a "severe" impairment, and in failing to consider that impairment in assessing his residual functional capacity. As an initial matter, [Plaintiff] was not denied benefits at the second step of the sequential evaluation process. <u>McCrea v. Commissioner of Social Security</u>, 370 F.3d 357, 361 (3d Cir. 2004) (remarking that "step two is to be rarely utilized as [a] basis for the denial of benefits"). Since the ALJ determined that [Plaintiff] had "severe" impairments, this case proceeded through the remaining steps of the process. The assessment of a claimant's residual functional capacity must account for both "severe" and "nonsevere" impairments. 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2). Where at least one impairment is found to be "severe" and the limitations resulting from the claimant's remaining impairments are properly considered, an error committed at the second step of the process with respect to one of those other impairments is inconsequential. <u>Lewis v. Astrue</u>, 498 F.3d 909, 911 (9th Cir. 2007); <u>Maziarz v. Secretary of Health & Human Services</u>, 837 F.2d 240, 244 (6th Cir. 1987)." <u>See McCleary v. Astrue</u>, No. 10–1116, 2011 WL 4345892, at *9 (W.D. Pa. Sept. 15, 2011).

Similarly in this case, the ALJ found Plaintiff had other severe impairments, and the decision

proceeded through the remaining steps in the disability process.

Even if the ALJ should have considered the intellectual disability (mental retardation) as a "severe" impairment, the error was harmless and would not have altered the result. The ALJ allocated for Plaintiff's credibly established limitations and found he could do a reduced range of sedentary work.

Plaintiff contends the ALJ erred in failing to obtain specific vocational testimony that his past semiskilled work as a heavy equipment operator (Tr. 59) was inconsistent with a sub 70 IQ, and SSR 82-41 requires that the ALJ make specific findings of fact regarding the transferability of skills from skilled or semi-skilled work and the specific jobs to which they transfer. Plaintiff states the Vocational Expert testified that the heavy equipment operator job had skills transferable to medium work only (Tr. 59), but did not identify what the skills were. Pl. Br. at 10, Doc. 12. Although the ALJ noted the prior history of a semiskilled job was inconsistent with the allegations of intellectual disability (mental retardation), the ALJ was not required to question the vocational expert regarding the requisite skills of his past relevant work. "Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2)." (Tr. 23).

The burden lies with Plaintiff to demonstrate harm from such error that would have changed the ALJ's decision, but he has not done so here. Shinseki v. Sanders, 556 U.S. 396, 409-10 (2009); see also Molina v. Astrue, 674 F.3d 1104, 1111, 1115-22 (9th Cir. 2012). "No principle of administrative law 'requires that we convert judicial review of agency action into a ping-pong game' in search of the perfect decision." Coy v. Astrue, No. 08-1372, 2009 WL 2043491, at *14 (W.D. Pa. July 8, 2009) (quoting NLRB v. Wyman-Gordon Co., 394 U.S. 759, 766 n.6 (1969)); see also Fisher

v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result").

### 2.    ALJ Review of Treating Psychiatrist Opinion

Plaintiff contends the ALJ erred in rejecting the opinion of Dr. De La Cruz, Plaintiff's psychiatrist, on the severity of his depression. Pl. Br. at 5, 11-14, Doc 12. The ALJ evaluated the medical opinions in conjunction with a review of the record.

"During a May 2010 psychiatric evaluation, the claimant denied any significant impairment in his concentration or memory, but continued to complain of irritability and becoming angry easily, noting he received no medication for his impairment since release from prison nearly 10 months prior. On a mental status examination, the claimant demonstrated good social skills, intact memory, organized cognition, and average intelligence. The claimant's psychiatrist, Sylvestre De La Cruz, M.D., diagnosed the claimant with Major Depressive Disorder and assessed a GAF of 55, consistent with no more than moderate symptoms or difficulties in social, occupational, or school functioning (Diagnostic and Statistical Manual of Mental Disorders – Fourth Edition (DSM-IV))." (Tr. 20) (emphasis added).

"That same day, Dr. De La Cruz completed a Department of Public Welfare Employability Assessment Form indicating the claimant's impairments permanently precluded the claimant from performing any gainful employment . . . the [ALJ] considered the opinion pursuant to Social Security Ruling 96-5p and accords the opinion little weight. The opinion is conclusory, providing very little explanation of the evidence relied upon in forming the opinion, rendering it less persuasive. Moreover, the opinion is inconsistent with Dr. De La Cruz's own treatment notes demonstrating adequate cognition, memory, and social functioning and is inconsistent with Dr. De La Cruz's own

assessment of the claimant's GAF, suggesting no more than moderate restrictions. Furthermore, Dr. De La Cruz assessed the claimant unable to work due to a combination of mental and physical restrictions, though Dr. De La Cruz treated the claimant only for mental health purposes. The extent of the opinion, therefore, exceeds Dr. De La Cruz's own professional knowledge of the claimant." (Tr. 20) (emphasis added).

"Moreover, Dr. De La Cruz's opinion is inconsistent with the claimant's later treatment notes, demonstrating that despite earlier, lower GAF scores, within seven months of reinitiating psychotropic medications, the claimant's providers noted his depression went into remission. The claimant's treatment notes further demonstrate a longitudinal history of grossly normal mental status examinations, and noted that throughout his first year of sustained treatment, his appetite, energy, motivation, and concentration remained within normal limits. The claimant's providers also stated at that time, that only the claimant's mood remained affected with the change in his medications and that his other symptoms remained well controlled and stable. Even the claimant's primary care physician commented that the claimant's mood seemed more even within several months of the re-initiation of the claimant's treatment." (Tr. 20) (emphasis added).

"As for the remainder of the opinion evidence, the [ALJ] gives great weight to the opinion of the State agency psychological consultant, determining that despite the claimant's low frustration tolerance, emotional liability, and history of distractive behavior, he retains the ability to perform repetitive work activities involving no more than simple decision-making and without constant supervision. While the [ALJ] notes that the claimant submitted additional psychological records dated after the consultant made their opinion, the new evidence does not demonstrate a significant decline in the claimant's longitudinal functioning. The consultant is a highly qualified psychologist who is an expert in the evaluation of the medical issues and disability claims, and the opinion is

consistent with the medical evidence of record." (Tr. 20-21) (emphasis added).

"The record also demonstrates the claimant suffers from Major Depressive Disorder, currently in remission. While the record shows the claimant continues to have a low frustration tolerance and extreme emotional liability, the claimant demonstrates good cognitive functioning and social skills on mental status examinations. To accommodate the claimant's residual impairment and any reasonable restriction due to his variable mood, the [ALJ] restricted the claimant to the performance of simple, repetitive tasks involving no more than occasional interaction with supervisors or coworkers. The clinical findings and observations, the opinion of the State agency psychological consultant, and the admissions contained in the record support this assessment." (Tr. 22).

### a. Case Law and Analysis

Thus, the ALJ evaluated the record, objective evidence, and credibility to assign the weight deemed appropriate to the opinion of Dr. De La Cruz, in accordance with case law and Social Security regulations.

The weight afforded to any medical opinion is dependent on a variety of factors, including the degree to which the opinion is supported by relevant evidence and consistent with the record as a whole. 20 C.F.R. § 404.1527(c)(3)-(4). Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion. 20 C.F.R. § 404.1527(c)(4). A treating physician's opinion does not warrant controlling weight under the regulations unless it is well supported by clinical and laboratory diagnostic findings and consistent with other substantial evidence. 20 C.F.R. § 404.1527(c)(2); Plummer, 186 F.3d at 429. If a treating source's opinion is not entitled to controlling weight, the factors outlined in 20 C.F.R. § 404.1527(c)(2) are used to determine the weight to give the opinion. Id. The more a treating source presents medical signs and

laboratory findings to support his medical opinion, the more weight it is entitled. <u>Id.</u> Likewise, the more consistent a treating physician's opinion is with the record as a whole, the more weight it should be afforded. <u>Id.</u> The Commissioner is not bound by a treating physician's opinion, and may reject it, if there is a lack of clinical data supporting it, or if there is contrary medical evidence. <u>Lyons-Timmons v. Barnhart</u>, 147 F. App'x 313, 316 (3d Cir. 2005).

The ALJ, not the treating or examining physician, must make the disability and residual functional capacity determination. 20 C.F.R. § 404.1527(d)(1)-(2); <u>Chandler v. Comm'r of Soc. Sec.</u>, 667 F.3d 356 (3d Cir. 2011). "The law is clear that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity." <u>Chandler</u>, 667 F.3d at 361; <u>Coleman v. Astrue</u>, 2012 WL 3835403, at *2 (3d Cir. Sept. 5, 2012) (holding that ALJ may choose non-examining physician opinion over treating physician opinion as long as medical evidence not rejected for wrong reason or no reason).

The case law in this circuit makes clear that physician opinions are not binding upon an ALJ, and that an ALJ is free to reject a medical source's conclusions. <u>Chandler</u>, 667 F.3d 356 at 361. In so doing, however, the ALJ must indicate why evidence was rejected, so that a reviewing court can determine whether "significant probative evidence was not credited or simply ignored." <u>Cotter v. Harris</u>, 642 F.2d 700, 705 (3d Cir.1981). <u>Mistick v. Colvin</u>, No. 12-cv-1031, 2013 WL 5288261 (W.D. Pa. Sept. 18, 2013).

In <u>Chandler</u>, 667 F.3d at 362, the Third Circuit held that the district court had erred in concluding that the "ALJ had reached its decision based on its own improper lay opinion regarding medical evidence." <u>Id.</u> "The ALJ– not treating or examining physicians or State agency consultants –must make the ultimate disability and RFC determinations." <u>Id.</u> at 361 (<u>citing</u> 20 C.F.R. 404.1527(e)(1), 404.1546(c)).

Plaintiff contends the state agency physician assessment was completed before Plaintiff had IQ testing, and it is conceivable the doctor would have placed additional restrictions on the Plaintiff's abilities. Pl. Br. at 12, Doc. 12. However, the ALJ found it would not have made a difference. "The State agency consultant opined the claimant's conditions did not equal a Listing, and the [ALJ] received no evidence since the State agency consultant issued the opinion that would reasonably change the outcome." (Tr. 17). Moreover, the ALJ rejected the IQ scores. "The [ALJ] does not accept this diagnosis as Mr. Thomas noted the claimant admitted having held a number of jobs including his most recent work as a semi-skilled Heavy Equipment Operator. Mr. Thomas further observed the claimant to not only answer direct questions but also to volunteer personally relevant information, and present as friendly and interactive. These admissions and observations are inconsistent with the implicit deficits in adaptive functioning necessary for a diagnosis of Mild Mental Retardation. The claimant's low IQ scores could more consistently be attributed to the claimant's regression in Academic Skills noted by Mr. Thomas. Moreover, the claimant's treating providers further observed and reported the claimant to possess average intelligence.  Accordingly, the [ALJ] finds the claimant's Mild Mental Retardation not medically determinable." (Tr. 15). In addition, case law supports assessments performed with a time lapse.

"Plaintiff also argues that because the conclusions of Dr. Schiller and Dr. Newman were reached prior to the amended alleged disability onset date of November 1, 2010, the ALJ's decision that Plaintiff's mental impairments cause only mild limitations is not supported by substantial evidence. Defendant counters that because the reports of Dr. Schiller and Dr. Newman were consistent with the record as a whole, the ALJ reasonably relied upon them, despite the fact that the reports were authored approximately three months prior to Plaintiff's amended disability onset date. Although the reports of Dr. Schiller and Dr. Newman were completed prior to Plaintiff's amended

alleged disability onset date, '[t]he Social Security Regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it.' Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Updated reports are required only if there is new medical evidence which in the opinion of the ALJ may change the findings of the consultative examiner. Id. (citing S.S.R. 96–6P, 1996 WL 374180, at *3–4). Moreover, as discussed above, the Court believes that the ALJ appropriately concluded that the report by Dr. Huang was inconsistent with the record and not supported by objective medical evidence. The ALJ properly found that the reports of Dr. Schiller and Dr. Newman were consistent with the record. Accordingly, the ALJ did not err in relying on the consultative examiners' reports rather than the later completed report by Dr. Huang. See Chandler, 667 F.3d at 356." See Donley v. Colvin, No. 13–775, 2013 WL 6498261, at *13 (W.D. Pa. Dec. 11, 2013).

### (1)    Plaintiff's GAF Score

Plaintiff contends the ALJ failed to properly evaluate his GAF score. Pl. Br. at 11, Doc. 12. The Diagnostic and Statistical Manual of Mental Disorders-IV, the source of the GAF scale, instructs that a GAF score is based on the symptom severity or level of functioning at the time of the examination. Courts within the Third Circuit have accepted the Commissioner's position that GAF scores are not dispositive of disability. See, e.g., Gilroy v. Astrue, 351 F. App'x 714, 716 (3d Cir. 2009) (explaining that a GAF score of 45 did not warrant remand given that no statement of specific functional limitations accompanied the score); Chanbunmy v. Astrue, 560 F. Supp. 2d 371, 383 (E.D. Pa. 2008).

"We further find no error with respect to the ALJ's evaluation of the Plaintiff's mental impairments in fashioning his RFC. The ALJ found Plaintiff was limited to simple, routine, repetitive tasks not involving fast pace or more than simple work decisions, and could have only

incidental collaboration with coworkers and the public and collaboration with the supervisor for about 1/6 of the time. Plaintiff argues that the ALJ's RFC finding failed 'to encapsulate all of the limitations flowing from [his] severe mental illness' and contends that his low GAF score of 45 demonstrates a complete inability to work. The ALJ specifically rejected this GAF score assessed by [the treating psychiatrist], however, as inconsistent with the remaining medical evidence. An ALJ may properly reject a GAF score when it is inconsistent or unsupported by the record as a whole. Torres v. Barnhart, 139 F. App'x 411, 415 (3d Cir. 2005); Blakey v. Astrue, 2010 WL 2571352 at *11 (W.D. Pa. 2010)." Klein v. Colvin, No. 13-cv-1497, 2014 WL 2562682, at *11 (W.D. Pa. June 06, 2014).

"Plaintiff next argues that the findings of consultative examiner [ ] were not properly credited by the ALJ. The ALJ noted the marked and extreme limitations findings, and low GAF score, assessed by [the consultative examiner] in his decision. The ALJ found—as did [the state agency evaluator]—that these findings were inflated, and not an accurate representation of Plaintiff's mental health history. In support of his position, the ALJ cited to Plaintiff's psychiatric treatment at Safe Harbor between October 2009 and October 2010, which revealed a marked—and sustained—increase in Plaintiff's GAF scores, as well as improved mental functioning. Observations by [the consultative examiner] about Plaintiff's appearance were at odds with those at Safe Harbor, as was the anomalous diagnosis of PTSD. Further, [the state agency evaluator] concluded based upon her evaluation of the medical record, that [the consultative examiner's] findings were out of proportion to what was found in Plaintiff's mental treatment history. Her limitations findings did not exclude Plaintiff from finding work. The court, therefore, finds that the ALJ adequately supported his decision to accord [the consultative examiner's] findings diminished weight with substantial evidence from the medical record, particularly the lengthy treatment record from Safe Harbor, the

latter portion of which revealed significant improvement in Plaintiff's mental status. Lastly, to the extent that Plaintiff argues that the ALJ erred in failing to accommodate [the consultative examiner's] finding of marked limitation with respect to interacting with the public, the ALJ clearly indicated that the work which Plaintiff could sustain would not include frequent interaction with the public. Specifically, the ALJ stated that 'the claimant has a need to avoid repetitive reaching, any climbing, and frequent interaction with the general public. As such, Plaintiff's argument is moot.' See Lamb v. Colvin, No. 12-cv-137, 2013 WL 5366260, at *10 (W.D. Pa. Sept. 24, 2013).

Similarly in this case, the ALJ weighed the evidence in the record and accommodated Plaintiff's depression impairment by limiting the residual functional capacity to a range of sedentary exertion with the restriction to unskilled work.

### 3.    ALJ Review of Medical Opinions for Plaintiff's Physical Impairments

Plaintiff contends the ALJ erred in rejecting the opinions for Plaintiff's physical limitations from the family doctor, Kendra Davis, D.O., and the consulting physical examiner, Jessica Ward, D.O. Pl. Br. at 5, 11-14, Doc 12. Plaintiff also argues the ALJ failed to assign any level of weight to the opinion of doctors at the Orthopedic Institute of Pennsylvania including Dr. Fernandez and Dr. DeLuca. The ALJ evaluated the medical opinions in conjunction with a review of the record.

### a. ALJ Review and Findings for Plaintiff's Physical Impairments

"The claimant has the following severe impairments: bilateral knee degenerative joint disease, morbid obesity, and Major Depressive Disorder. 20 C.F.R. § 404.1520(c) and 416.920(c)." (Tr. 14).

"The record demonstrates the claimant suffers from a history of diabetes, diagnosed in 2007, but initially admitted he requires no medication for his condition, and that diet alone controls his symptoms. By 2011, the claimant's providers notably increased his treatment to include diet, oral

medications, and fingerstick blood sugars. The record also reveals that the claimant's physicians diagnosed him with hypertension and a sleep disorder. However, the records reveal the claimant's hypertension is benign and the claimant's sleep apnea is controlled with the use of a CPAP. Accordingly, the [ALJ] finds the claimant's diabetes, hypertension, and obstructive sleep apnea non-severe." (Tr. 14-15).

"The claimant also alleges disability due to lower back pain. However, X-rays of the claimant's spine revealed no abnormalities, and later MRIs demonstrated no evidence of degenerative disc disease, no evidence of herniated nucleus pulposus, or any other impairment that could reasonably cause the claimant's complaints. The [ALJ] finds the claimant's low back pain non-medically determinable." (Tr. 15).

"The [ALJ] considered the claimant's bilateral knee degenerative joint disease under Listing 1.02. Despite some problems and limitations, the claimant maintains the ability to ambulate effectively and to perform fine and gross movements effectively as the Commissioner's regulations define those terms. Although the claimant stated he moves slowly and requires additional time due to pain, he admitted he retains the functional ability to perform personal care activities, prepare meals, complete housework, and shop for groceries. The claimant's bilateral knee degenerative joint disease does not meet the requirements of Listing 1.02 or any other Listing." (Tr. 15).

"While there is no Listing for obesity, the [ALJ] considered the impact of the claimant's obesity upon his other impairments when determining whether any impairment met or equaled the requirements of a Listing pursuant to Social Security Ruling 02-1p." (Tr. 17).

"After careful consideration of the entire record, the [ALJ] finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) and 416.967(a) except the claimant is limited to the performance of simple, repetitive tasks involving

no more than occasional interaction with supervisors or co-workers; no more than occasional bending, kneeling, stooping, crouching, balancing, or climbing; and no use of foot controls. The claimant also requires the use of a cane to ambulate." (Tr. 17).

"The claimant alleges disability due depression, Bipolar Disorder, diabetes, arthritis, and back pain. Due to his impairments, the claimant stated he has difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, seeing, hearing, concentrating, understanding, using his hands, and getting along with others. The claimant reported he could walk for no more than 20 feet before needing to stop and rest." (Tr. 18).

"At the hearing, the claimant testified he stopped working because he could not climb up onto the work equipment secondary to pain. He stated that walking and climbing exacerbate his pain and that he requires the assistance of a cane for ambulation. He noted he could stand for only 15 minutes at once; has difficulty lifting a gallon of milk; and must lie down for two or three hours at least three times per day. Due to his depression, the claimant reported suffering from mood swings, bursts of anger, and crying spells. The claimant also noted he experiences memory loss.'" (Tr. 18).

"The medical evidence also does not support the allegations regarding the intensity, persistence, and limiting effects of the claimant's impairments." (Tr. 19).

"The record reveals the claimant complained of bilateral knee problems dating back to his alleged onset date. On examinations, his providers initially observed some non-pitting lower extremity edema. However, despite his allegations of difficulties dating back to his alleged onset date in November 2008, the record reveals the claimant did not seek any treatment for his impairment until August 2010. The claimant's orthopedic treatment notes reveal the claimant as morbidly obese and presenting with antalgic gait, edematous lower extremities, extreme tenderness to even light touch about his knees, and crepitus with bilateral knee range of motion. Nevertheless, the claimant's

X-rays reveal only mild bilateral degenerative joint disease in his knees; the claimant's physical examinations reveal the claimant retains full range of motion, strength, and sensation; and the claimant's treating physicians even stated the extent of his alleged pain is out of proportion with the clinical findings and examination." (Tr. 19) (emphasis added).

"In June 2010, the claimant also presented to Jessica Ward, D.O., for a consultative medical evaluation, complaining of bilateral upper and lower extremity paresthesias, difficulty walking, getting up and down from sitting, and pain with lying down. On examination, Dr. Ward noted the claimant was extremely tender to palpation of his bilateral knees and demonstrated decreased upper extremity range of motion and antalgic gait, but noted the claimant retained full strength, reflexes, and sensation and demonstrated negative straight leg testing in both the sitting and supine positions. Dr. Ward diagnosed the claimant with bilateral knee pain and degenerative disc disease, assessing the claimant capable of performing a limited range of light exertional work, with no more than one hour standing / walking; needing a cane for balance and ambulation; never performing postural activities; and limited reaching, handling, and fingering. The [ALJ] gives little weight to Dr. Ward's assessment because it is apparent Dr. Ward based the opinion on the claimant's less-than-credible, subjective allegations. Notably, Dr. Ward diagnosed the claimant with degenerative disc disease despite X-rays performed the same day demonstrating no evidence of any acute abnormality or significant degenerative change in the claimant's spine. the extent of Dr. Ward's assessed postural limitations is also inconsistent with her own clinical observations, demonstrating normal strength and lower extremity range of motion. Dr. Ward is a one-time, non-treating source and her opinion is inconsistent with the medical record as a whole." (Tr. 19).

"The [ALJ] gives little weight to the opinion of the State agency medical consultant. The consultant is a one-time, non-examining, non-treating source and the evidence received at the

hearing level, including the claimant's updated orthopedic records, reveal the claimant is more limited than opined by the medical consultant." (Tr. 21).

"The [ALJ] also notes that in May 2011, Kendra Davis, M.D., completed a Department of Public Welfare Employability Assessment Form indicating the claimant's impairments permanently precluded the claimant from performing any gainful employment . . . the [ALJ] considered the opinion pursuant to Social Security Ruling 96-5p and accords the opinion little weight. The opinion is conclusory, providing very little explanation of the evidence relied upon in forming the opinion, rendering it less persuasive. Moreover, the opinion is purportedly based on a combination of the claimant's low back pain, diabetes, hypertension, sleep apnea, and mental health disorders, but Dr. Davis does not treat the claimant for low back pain or mental health disorders and Dr. Davis' own treatment notes reveal the claimant's diabetes, hypertension, and sleep apnea are not severe. The record also reveals the claimant's low back pain is not medically determinable. Dr. Davis' opinion exceeds the extent of her own treatment relationship with the claimant; her opinion is inconsistent with her own medical findings; and her opinion is inconsistent with the record as a whole." (Tr. 21).

"The medical evidence does not support the allegations regarding the intensity, persistence, and limiting effects of the claimant's impairments. As discussed above, the medical evidence does not support the claimant's allegations regarding the severity and extent of his diabetes, hypertension, sleep apnea, low back pain . . . While the claimant also alleges difficulty standing and walking due to knee pain, the claimant's continuing treatment notes reveal the claimant retains full strength and range of motion in his lower extremities. Though the claimant alleges the need for a cane, the record shows that no physician prescribed the cane. The claimant's fiancee even noted the claimant took the cane from his grandmother. While the claimant alleges difficulty concentrating and understanding, the claimant's mental status examinations and continuing treatment notes reveal the

claimant demonstrates normal cognitive functioning, motivation, and memory. The medical evidence does not support the claimant's allegations." (Tr. 21) (emphasis added).

"The record supports the above assessment of the claimant's residual functional capacity. The record demonstrates the claimant suffers from bilateral knee degenerative joint disease and obesity, resulting in some giveway lower extremity weakness, crepitus, and subjectively extreme tenderness on palpation. To accommodate these impairments and any reasonable degree of impairment based on the claimant's allegations, the [ALJ] restricted the claimant to sedentary work involving no more than occasional bending, kneeling, stooping, crouching, balancing, and climbing, and no operation of foot controls. Even though the record does not demonstrate the claimant's medical need to use a cane, the [ALJ] nonetheless finds the claimant requires the use of a cane for ambulation to accommodate any additional potential exacerbation of the claimant's knee problems due to his morbid obesity." (Tr. 22).

### b. Case Law and Analysis for Plaintiff's Physical Impairments

Thus, the ALJ evaluated the objective evidence and credibility to assign the weight deemed appropriate to the doctors in the record and the consulting physical examiner, in accordance with case law and Social Security regulations.

The ALJ was not required to accept Dr. Davis' statement of permanent disability (Tr. 415). Like Dr. De La Cruz's statement, Dr. Davis' statement appears on a Pennsylvania Department of Public Welfare form (Tr. 415). It is not a medical source opinion for purposes of Plaintiff's Social Security application; such an opinion would typically describe functional limitations restricting a claimant's ability to perform basic work activities. See 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). As the ALJ explained, rather than providing a functional assessment, the form addressed an issue reserved to the Commissioner under 20 C.F.R. § 404.1527(d) - namely, whether Plaintiff is disabled

(Tr. 21). It was thus of limited value in the Social Security disability analysis. See, e.g., Mason, 994 F.2d at 1065 (two-page New Jersey Division of Rehabilitation form on which treating physician merely "check[s] boxes" and "fill[s] in blanks" was "weak evidence at best"); Mravintz v. Astrue, 2009 WL 4723133 at *5 (W.D. Pa. Dec. 2, 2009) (Pennsylvania Department of Public Welfare form was not binding and contained "no function by function analysis" of Plaintiff's limitations); Coates v. Astrue, 2009 WL 1514457, at *9 (W.D. Pa. May 29, 2009) (ALJ properly assigned little weight to welfare form; it was not accompanied by detailed explanations and was part of an assessment for a state disability program under different standards); DiGiacomo v. Comm'r of Soc. Sec., 2010 WL 1650031, at *4 (E.D. Pa. Apr. 19, 2010) ("'[f]orm reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best'") (quoting Mason).

Moreover, the ALJ further explained that Dr. Davis premised her opinion partly on conditions that had not resulted in any functional limitations (Tr. 21, 416). The "mere existence of a diagnosis" is insufficient to establish disability; rather, "there must be functional limitations which prevent the performance of any substantial gainful activity." Talmage v. Astrue, 2010 WL 680461, at *7 (W.D. Pa. Feb. 24, 2010).

Dr. Davis further premised her opinion in part on conditions that were being addressed by the treating orthopedic specialists (Tr. 21, 416). For their part, the treating orthopedic specialists offered no opinion of disability. On the contrary, the orthopedists were never able to correlate the degree of limitation Plaintiff claimed to experience with any medical findings (Tr. 422, 381).

Plaintiff argues that the ALJ failed to afford "weight" to the opinions of the treating orthopedic specialists (Pl. Br. at 15), but the orthopedists never offered an opinion, only individual treatment notes. Opinions are assessed specially under the regulations because they may provide a "longitudinal picture" of the claimant's impairment and "may bring a unique perspective to the

medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations. . . ." 20 C.F.R. § 404.1527(c)(2).

Even when an ALJ gives considerable weight to an opinion, he is not required to adopt an opinion wholesale and include every degree of limitation in the RFC. See, e.g., Lambert-Newsome v. Astrue, 2012 WL 2922717, at *6 (S.D. Ill. July 17, 2012) (noting the ALJ gave great weight to an opinion "does not mean he was required to adopt it wholesale."); Woodrome v. Astrue, 2012 WL 1657216, at *3 (W.D. Mo. May 10, 2012) (noting the ALJ did not adopt opinion by giving it great weight).

"[T]he ALJ is not bound to accept every limitation that is found by a medical professional, but rather only the ones that she finds are credibly established by the record. See Salles v. Comm'r of Soc. Sec., 229 Fed. Appx. 140, 147 (3d Cir. 2007). Contrary to Plaintiff's assertion, the ALJ did not err by incorporating into her RFC finding only those limitations which she found to be credibly established by the objective medical evidence and the Court finds that the ALJ's RFC determination as well as her ensuing hypothetical to the vocational expert both enjoy the support of substantial record evidence. Finally, the Court finds that the ALJ evaluated the medical opinion evidence properly and in accordance with the applicable rules and regulations and that substantial record evidence supports her evaluation. The ALJ gave a detailed explanation for why the medical source statements from the mental health providers were not given controlling weight the ALJ discussed at length her justification for why the medical source statements from Dr. Jahangeer and Ms. Walker were inconsistent with and contradicted by the other medical evidence of record, including their own notes and prior findings. The Court finds that the ALJ discharged her duty because she (i) demonstrated her consideration of all the relevant medical evidence, (ii) addressed the contradictory evidence in the record which conflicted with her findings, and (iii) explained why that contrary

evidence was rejected or not given controlling weight. See Cotter, 642 F.2d at 705. Indeed, the overarching theme of the ALJ's decision was the complete lack of objective medical evidence which corroborated or even tended to support Plaintiff's complaints of severely disabling impairments and the Court agrees with the ALJ's finding that such corroborating evidence was woefully lacking in the record. Plaintiff's subjective complaints were corroborated only by her own self-reports, which—for the reasons discussed by the ALJ—were not particularly credible. To that end, the Court finds that the ALJ's credibility determination is well-supported by the record and that Plaintiff's arguments to the contrary are completely unpersuasive, particularly given the minimal treatment record, the inconsistencies in the record that were highlighted and discussed by the ALJ . . . Accordingly, the Court concludes that substantial record evidence supports the ALJ's determination of non-disability." Stewart v. Astrue, No. 13–73, 2014 WL 29035, at *1, n.1 (W.D. Pa. Jan. 2, 2014).

Similarly in this case, the record does not support Plaintiff's assertions of disabling severity. Plaintiff's contentions of error are inconsistent with the objective evidence and activities of daily living. From the ALJ's extensive review, substantial evidence supports the weight accorded to the allegations and opinions of record.

Thus, the ALJ's RFC finding includes only "credibly established limitations" and not all impairments alleged by claimant, Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005). Accordingly, the ALJ relied on the record and testimony in determining Plaintiff's residual functional capacity, and the findings are supported by substantial evidence.

### 4.    ALJ's Credibility Determination

Plaintiff contends the ALJ erred by discounting his credibility. Pl. Br. at 4, 10-11, Doc 11. The ALJ reviewed the record to evaluate Plaintiff's credibility.

When evaluating the credibility of an individual's statements, the adjudicator must consider

the entire case record and give specific reasons for the weight given to the individual's statements. SSR 96–7p, 61 Fed. Reg. 34483 (July 2, 1996). In particular, an ALJ should consider the following factors: (1) the plaintiff's daily activities; (2) the duration, frequency and intensity of the plaintiff's symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms; (5) treatment, other than medication for relief of the symptoms; (6) any measures the plaintiff uses or has used to relieve the symptoms; (7) the plaintiff's prior work record; and (8) the plaintiff's demeanor during the hearing. See 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); Jury v. Colvin, No. 3:12-cv-2002, 2014 WL 1028439 (M.D. Pa. Mar. 14, 2014). When the Court reviews  the ALJ's decision, "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." Walters v. Commissioner of Soc. Sec., 127 F.3d 525, 531 (6th Cir.1997) (citing Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir.1991) ("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility.")). Furthermore, in determining if the ALJ's decision is supported by substantial evidence the court may not parse the record but rather must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

The ALJ provided the reasons for discounting Plaintiff's credibility. "Furthermore, the [ALJ] also does not find the allegations regarding the intensity, persistence, or limiting effects of the claimant's impairments entirely credible due to inconsistent information given in the record, the medical reports, and at the hearing by the claimant. The claimant testified at the hearing that he could not lift a gallon of milk due to the extent of his pain. However, the record demonstrates the claimant admitted that during a recent mood swing, he threw a 42 inch television across the room, breaking

it. The claimant also testified that he needs to lie down two or three times per day for up to three hours in order to relieve back pain, but reported to his physicians that lying down aggravates his alleged back pain. Although the inconsistent information provided by the claimant may not be the result of a conscious intention to mislead, the inconsistencies suggest that the information provided by the claimant may not be entirely reliable." (Tr. 21-22) (emphasis added).

The ALJ continued his credibility analysis. "In the record, the claimant also described daily activities that are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. The claimant and his girlfriend both admitted the claimant retains the ability to perform all personal care activities, prepare his own meals daily, mow his grass, wash his laundry, perform household repairs, travel independently, shop in stores for up to three hours at one time, and manage money, demonstrating a greater ability to perform physical and cognitive tasks than alleged in connection with his application and appeal. While none of these factors alone is inconsistent with a finding of disability, taken together, they are suggestive of an individual capable of performing work activity on a sustained basis within the above residual functional capacity." (Tr. 22) (emphasis added).

Determinations of credibility "are for the ALJ to make." Malloy v. Comm'r of Soc. Sec., 306 F. App'x 761, 765 (3d Cir. 2009). The Court is "not permitted to weigh the evidence or substitute [its] own conclusions for that of the fact-finder." Burns v. Barnhart, 312 F.3d 113, 118 (3d Cir. 2002). Applying these standards, there is no basis to override the ALJ's reasonable determination that Plaintiff's symptoms did not render him incapable of even a limited range of simple, sedentary work.

Thus, the ALJ's decision was consistent with the medical evidence in the record and Plaintiff's testimony at the ALJ hearing. Accordingly, substantial evidence supports the ALJ's

findings regarding Plaintiff's credibility.

### V.    Conclusion

Therefore, the Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1382c; <u>Brown</u>, 845 F.2d at 1213; <u>Johnson</u>, 529 F.3d at 200; <u>Pierce</u>, 487 U.S. at 552; <u>Hartranft</u>, 181 F.3d at 360; <u>Plummer</u>, 186 F.3d at 427; <u>Jones</u>, 364 F.3d at 503.

Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla of evidence. It does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971).

Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands. <u>Monsour Med. Ctr.</u>, 806 F.2d at 1190. Here, a reasonable mind might accept the evidence as adequate, and the Court will affirm the decision of the Commissioner pursuant to 42 U.S.C. §§ 405(g); 1383(c)(3).

An appropriate order in accordance with this memorandum to deny Plaintiff's appeal will follow.

Dated: September 24, 2014                               s/Gerald B. Cohn
                                                    _____
                                                         GERALD B. COHN
                                                    UNITED STATES MAGISTRATE JUDGE